# National Bank of Brunswick *v.* Sixth National Bank, Appellant.

*Banks and banking—Guaranty—Draft.*

A national bank has no power or authority to become a mere accommodation indorser or guarantor of the payment of the debt of another without benefit to itself.

The cashier of a national bank cannot bind the bank to pay the draft of a third person drawn on one of its customers, where it appears from the correspondence and the conduct of the parties and the existing circumstances, that it was not the intention of the bank to purchase the draft but merely to guarantee it.

Argued Jan. 26, 1905. Reargued May 11, 1905. Appeal, No. 349, Jan. T., 1904, by defendant, from judgment of C. P. No. 3, Phila. Co., June T., 1902, No. 2265, on verdict for plaintiff in case of National Bank of Brunswick v. Sixth National Bank. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT, POTTER and ELKIN, JJ., on reargument. Reversed.

Assumpsit on a promise to accept drafts drawn on a third person. Before FINLETTER, P. J.

The facts are stated in the opinion of the Supreme Court.

*Errors assigned* among others were in admitting in evidence letters of June 17, 1902 and various drafts, in refusing binding instructions for defendant, and in entering judgment for the plaintiff on the point of law reserved.

*Henry P. Brown*, with him *John Dickey, Jr.*, for appellant. —A national bank has no power to guarantee the draft of a third person on one of its customers, to be drawn on a future day: Bowen v. Needles Nat. Bank, 94 Fed. Repr. 925 ; Seligman v. Bank, 3 Hughes, 647 ; Johnston Bros. v. Bank, 3 Hughes, 657 ; Flannagan v. California Nat. Bank, 56 Fed. Repr. 959; Commercial Nat. Bank v. Pirie, 82 Fed. Repr. 799 ; Fowler v. Scully, 72 Pa. 456 ; First Nat. Bank of Moscow v. American Nat. Bank, 173 Mo. 153 (72 S. W. Repr. 1059).

A national bank has power to purchase paper by way of discount: Danforth v. Nat. State Bank of Elizabeth, 48 Fed. Repr. 271.

*H. B. Gill*, with him *John R. Read, Silas W. Pettit* and *Louis B. Runk*, for appellee.—It is submitted that the meaning of the words " we will accept " in the letter of the defendant bank was an agreement to take and pay for the drafts. The meaning is to be derived from the subject-matter to which the words are applied: Woodward v. Grain Commission Co., 43 Minn. 260 (45 N. W. Repr. 433) ; Espy v. First Nat. Bank, 85 U. S. 604; Boyce v. Edwards, 29 U. S. 111.

Authority to a bank to discount evidences of debt includes authority to buy : Atlantic State Bank v. Savery, 82 New York, 291; Tracy v. Talmage, 18 Barbour, 456 ; Fleckner v. U. S. Bank, 21 U. S. 338 ; Bank v. Sherburne, 14 Ill. App. 566 ; Brown v. Nat. State Bank, 3 U. S. App. 7 ; First Nat. Bank v. Harris, 108 Mass. 514.

OPINION BY MR. JUSTICE MESTREZAT, May 22, 1905 :

Brown & Company were dealers in melons in the state of Georgia.　J. F. Eilenberg was a produce dealer in the city of Philadelphia.　Under date of June 17, 1902, the cashier of the Sixth National Bank of Philadelphia, the defendant, wrote the National Bank of Brunswick, Georgia, the plaintiff, as follows : " Gentlemen : We will accept drafts drawn on J. F. Eilenberg

by Brown & Company for watermelons and cantaloupes, melons not to exceed $100 per car and cantaloupes not to exceed $500 per car, bills of lading attached, until further notice." In reply to this communication, on June 20, the cashier of the National Bank of Brunswick wrote the following letter : "Gentlemen: We beg to own receipt of your valued favor of the 17th inst., guaranteeing drafts to be made by Brown & Company, on J. F. Eilenberg against bills of lading for watermelons and cantaloupes at the rate of $100 per car for the former and $500 per car for the latter. Please advise whether or not bills of lading are to be ' to order ' and whether the rate named includes prepaid frieghts." On June 23, the defendant bank by its cashier wired the plaintiff bank that the drafts were not to be to order and that the rate named did not include prepaid freight. The receipt of this message was acknowledged by the cashier of the National Bank of Brunswick by a letter, dated June 21, as follows : "Dear Sir : We are in receipt of your telegram of this date and in negotiating drafts drawn on Mr. J. F. Eilenberg by Messrs. Brown & Company will be governed accordingly."

Subsequent and pursuant to these communications, Brown & Company drew nine sight drafts for different amounts addressed to J. F. Eilenberg, care of the Sixth National Bank, Philadelphia, Pa., in favor of the National Bank of Brunswick, Georgia, noting thereon the number of the car and that it was for melons. There was attached to each draft a bill of lading for a car load of melons. The first of these drafts was dated June 26, 1902, the last, July 3, 1902. When the drafts were received by the National Bank of Brunswick, they were, by agreement between the bank and Brown & Company, to be placed to the credit of Cave & Company, depositors in the bank, in their account. The credit was to be given at the time the drafts were delivered to the bank. The first two drafts were sent by the plaintiff to the Merchants' National Bank of Philadelphia, its Philadelphia correspondent, and were duly paid. On July 1, the plaintiff bank received from Brown & Company two drafts and credited them to Cave & Company. On the same day, but after banking hours, it received another draft, and on July 2, placed it to the credit of Cave & Company. On July 3, the plaintiff received from Brown & Com-

pany a draft and gave Cave & Company credit for it on the same day. On that day, the plaintiff also received three other drafts after banking hours and placed them to the credit of Cave & Company on July 5, the next succeeding business day. No credit was given Brown & Company for the drafts drawn by them, and the credit given Cave & Company was the consideration paid by the plaintiff bank for the drafts. The seven unpaid drafts were sent by the plaintiff to its Philadelphia correspondent and payment was refused, both by Eilenberg and the defendant bank. The plaintiff first learned of the nonpayment of the two drafts received by it on July 1, late in the afternoon of July 3 by a telegram from its Philadelphia correspondent; and through the same source it was first advised of the nonpayment of the other drafts on July 5.

Late in the afternoon of July 3, and subsequent to the receipt by the plaintiff bank of all the drafts drawn by Brown & Company, but before credit had been given on the books of the bank for three of the drafts, the plaintiff received from the defendant the following telegram:

" PHILADELPHIA, July 3, 1902.

" BANK OF BRUNSWICK, Brunswick, Ga.:

" We revoke order to pay drafts to Eilenberg by Brown & Co., per ours of 6/17th.

" SIXTH NATIONAL BANK OF PHILADELPHIA,
" DANIEL BAIRD,
" Cashier."

This action is assumpsit and was brought to recover the amount of the unpaid drafts and the accrued interest. The statement avers that on the faith of the agreement made by the correspondence between it and the defendant, and prior to the telegraphic cancellation of that agreement, it purchased the drafts with the bills of lading attached ; that they were presented to J. F. Eilenberg and payment was refused, and that subsequently the defendant bank, on demand, also declined payment. On the trial of the cause, the learned judge instructed the jury to find a verdict for the plaintiff for the amount of all the drafts, " subject to the point of law reserved that if hereafter the court should be of the opinion that a cashier of a national bank cannot bind the bank to pay the draft of

a third person drawn on one of its customers, to be drawn at a future day, the court will have the right to enter judgment for the defendant non obstante veredicto." Subsequently, the court entered judgment for the plaintiff on the question of law reserved. The defendant has taken this appeal.

The defense set up to defeat a recovery in this action is, as stated in the printed brief of appellant's counsel, " that a national bank has no power to guarantee the draft of a third person on one of its customers, to be drawn on a future day ; that such guaranty is ultra vires, and no action will lie against the bank for its refusal to pay such a draft, in the absence of evidence to show that the bank received the fruits of the transaction." To this proposition the plaintiff replies that the agreement between the parties was not a guaranty of the payment of the drafts to be drawn by a third person on one of its customers, but a contract to purchase the drafts ; and that, therefore, the agreement between the parties was not ultra vires the defendant bank.

In determining whether the transaction between the plaintiff and defendant was a guaranty or a purchase of the drafts in suit, recourse must be had, not only to the written communications which passed between the parties, but also to the acts of the parties and the circumstances surrounding the transaction. The language of the letters and telegrams does not clearly disclose the intention of the parties. When, however, it is read in the light thrown upon it by the conduct of the parties and the existing circumstances, the conclusion we think is irresistible that both parties regarded the contract entered into by them as one of guaranty and not of purchase. The initiatory letter came from the defendant bank on June 17, 1902, and shows that the drafts were to be drawn by Brown & Company, on Eilenberg for melons purchased by the drawee of the drawers. The name of the payee is not mentioned, nor does the evidence disclose who the payee was to be or what negotiations took place between the parties prior to the date of the letter. It is drafts of this character that the defendant agreed to " accept." Had the drafts been drawn on the defendant bank and it had agreed to pay them, its liability would be unquestioned. The defendant, however, was not to be the drawee in the drafts, and hence by the use of the word " ac-

cept " the defendant could not have been regarded by the parties as assuming the liability of an ordinary acceptor of a draft or bill of exchange. This leaves the undertaking of the defendant bank, as disclosed by the letter, uncertain and unintelligible, requiring explanation dehors the paper. It received no consideration for its contract. Immediately following and acknowledging the receipt of the defendant's communication, we have the letter of the plaintiff bank which discloses its interpretation of the defendant's agreement. It construes the defendant's contract as " guaranteeing drafts to be made by Brown & Company, on J. F. Eilenberg against bills of lading for watermelons and cantaloupes at the rate of $100 per car for the former and $500 per car for the latter." This language is clear of doubt, and the term used by the writer in designating the character of the defendant's undertaking, unlike that employed by the defendant bank for the same purpose, leaves no uncertainty as to the liability which the plaintiff thought the defendant had assumed by its communication of June 17. As thus interpreted, the defendant's contract was a guaranty of the payment of the drafts by Eilenberg to be drawn on him by Brown & Company, in payment for the melons. So far as the evidence discloses, no other or different interpretation was subsequently placed on the contract by either party until after this action had been brought. On the contrary, the acts of the parties were all confirmatory of this construction of the agreement. As appears by the testimony of the plaintiff's cashier, the first two drafts, drawn in pursuance of the agreement between the parties, were sent by the plaintiff bank to the Merchants' National Bank, its Philadelphia correspondent, and paid in that city. The testimony does not show who paid the drafts, but as Eilenberg was the drawee and payer and resides in Philadelphia, it must be assumed that they were presented to and paid by him. When the drafts in suit were drawn and received by the plaintiff bank, it pursued the same course and sent them to its Philadelphia correspondent. They were first presented to Eilenberg, who refused to accept or pay them and they were protested. It was not until Eilenberg had declined to honor them that they were presented for payment to the defendant bank. This course of conduct on the part of the plaintiff with regard to each of the several drafts leads to

but one conclusion, and that is, that it regarded the defendant as secondarily liable on the drafts. It is plainly and clearly contradictory of the theory that the defendant was to be considered as having purchased the drafts and thereby to have assumed a primary liability for their payment. If that was the theory of the plaintiff and that was the interpretation of the contract, why did it first present the drafts to Eilenberg, the drawee, for payment? Why was he not ignored in the transaction and payment demanded of the defendant in the first instance?

As further evidence of a like construction by the plaintiff of defendant's agreement, it will be observed that in each instance when the plaintiff transmitted the drafts to the Merchants' National Bank of Philadelphia for collection it gave in its letter the names of the drawers of the drafts and stated that Eilenberg was the payer. No reference whatever was made in these communications to the defendant bank or to its liability to pay the drafts. Again, during the trial of the cause, the plaintiff's counsel made an offer, which was rejected, to show that at the date of the letter of June 17, the defendant had in its possession as a depositary of J. F. Eilenberg, the drawee, upwards of $10,000. This testimony would only be admissible on the theory that the defendant's liability was that of a surety or guarantor, and the offer, therefore, supports the contention that such was the purpose of the defendant's contract.

We are of opinion that the liability of the defendant bank was that of guarantor and not as purchaser of the drafts. It is conceded by the plaintiff " that the weight of authority is in favor of the position that a national bank has no power or authority to become a mere accommodation indorser or guarantor of the payment of the debt of another without benefit to itself." So far as we are advised, the question has not been determined by the supreme court of the United States, but the inferior courts of that jurisdiction have uniformly put this construction on the powers of a bank chartered under the national banking act, and as the subject is one of federal origin and of federal control, we must follow those precedents: Fowler v. Scully, 72 Pa. 456. We, therefore, hold that the contract on which this suit was brought was ultra vires the

defendant bank, and that the court erred in entering judgment for the plaintiff.

The judgment of the court below is reversed, and judgment is now entered on the reserved question for the defendant *non obstante veredicto.*