AMERICAN EXPRESS COMPANY, Appellant, vs. CITIZENS STATE BANK, Respondent.

*March 10—June 18, 1923.*

*Banks: Acceptance of time draft for customer's benefit: Public policy: Power to lend credit: Certified checks: Ultra vires acts: Estoppel: Statutes: Legislative construction: Weight: Costs: Disbursement for bond in garnishment.*

1. Acceptance by a bank of a draft payable in ninety days for the benefit of a customer without security or consideration is not within the description "buying, discounting and negotiating promissory notes, bonds, drafts, bills of exchange, foreign and domestic, and other evidences of debt," which by sec. 2024—9, Stats. 1919, the bank has power to do.
2. Under the power to negotiate their own bills and drafts, banks have the power to indorse them, since that is the usual mode of transferring title to such paper.
3. A bank has no power to become the guarantor of another's obligation without benefit to itself, unless expressly permitted by its charter or the governing statute.
4. There is no such similarity between certified checks and drafts payable at a future date that the authority given by sec. 2024—37, Stats. 1919, to issue certified checks implies the power to issue time drafts.
5. Though the courts finally determine the construction of statutes, the legislative construction thereof is entitled to consideration and often has great weight.
6. A corporation cannot commit the rank injustice of enriching itself by retaining the fruits of a contract and then repudiating it.
7. In view of the limitation imposed on the powers of state banks and the express refusal of the legislature to confer on them the right to accept time drafts, acceptance by a state bank

with a capital of $30,000 of a ninety-day draft for $8,180 drawn on one of its customers, which owed the bank $90,000 and had $100 on deposit, and from which the bank received no security or benefit, was not only beyond its powers but contrary to public policy.

8. Under the facts in this case the bank was not estopped to plead the defense of *ultra vires* and had the right to defend on that ground.

9. Neither sub. (1), sec. 2921, Stats. 1919 (providing that costs include all necessary disbursements and fees of officers allowed by law), nor sec. 2771 (that, on the discharge of the garnishee and surrender of the money or property, the costs shall be taxable as disbursements of plaintiff in the action if he recovers), is a warrant for taxing as costs the amount paid for a surety bond releasing an account of the defendant bank garnished in another bank.

APPEAL from a judgment of the circuit court for Waukesha county: C. M. DAVISON, Circuit Judge. *Affirmed*.

This is an action against the *Citizens State Bank* as acceptor of the following bill of exchange:

"New York, January 8, 1921.
"Ninety days after date pay to the order of American Express Company eight thousand one hundred eighty-two 00-100 dollars, against 300 bags sugar beet seed.

"Value received, and charge the same to account of Wisconsin Sugar Company.
                    "(Signed)          HERBST BROTHERS.
"To Citizens State Bank,
"No. 19276                Menomonee Falls, Wis."

The seed in question had been imported by Herbst Brothers and shipped to the *American Express Company* at Menomonee Falls to fill an order from the Wisconsin Sugar Company. A bill of lading covering the shipment, an invoice to the Wisconsin Sugar Company, and a sight draft upon the Wisconsin Sugar Company were delivered to the *American Express Company*, which had furnished a letter of credit to Herbst Brothers for the purchase of the seed.

These papers were forwarded to the agent of the *Express Company* at Milwaukee with instructions to deliver the bill of lading to the Wisconsin Sugar Company upon payment

of the draft.    The Sugar Company could not pay the draft and began negotiations with Herbst Brothers and the *Express Company* for time.    This sight draft was not used.

As a result of these negotiations another draft, the one upon which suit is brought, was mailed to the Wisconsin Sugar Company by Herbst Brothers.    The name of the drawee was left blank when the draft was mailed and the name of the defendant bank was inserted by the Sugar Company.

On January 11, 1921, Egan, an agent of the Sugar Company, took the draft to the bank, handed it to Warth, then acting as assistant cashier of the bank, and asked him "to take care of it."    Warth then wrote in red ink across the face of the draft, according to the testimony of Warth and Egan, "Accepted, Jan. 11, 1921.    Payable at Citizens State Bk.    George E. Warth, A. Cashier."    He then looked it over and, according to their testimony, saw that he had not signed it as a trade acceptance and then interlined the words, after the date, "By Wisconsin Sugar Company."    On the same day Egan took the draft to one Forsman, agent of the plaintiff in Milwaukee, and got the shipping papers.

Forsman sent the draft to plaintiff in New York, along with a letter which, at the trial, was not allowed in evidence. Agents of the plaintiff in New York sent the bill to Menomonee Falls for indorsement by the Sugar Company and later secured the indorsement of Herbst Brothers.    In the early part of April it was forwarded through banking channels for collection.    About April 8th it was sent by the First Wisconsin National Bank of Milwaukee to defendant, and a few days thereafter a protest for nonpayment in the usual form, signed by Warth as a notary public, was sent to the parties interested.    This protest stated that the draft had been presented for payment to the *Citizens State Bank* and that payment had been refused because of lack of funds.

At the trial the depositions of three of plaintiff's employees in New York were offered in evidence.    The deponents stated that they saw the draft when it was received in

New York about January 14, 1921; and that the draft appeared to have been accepted by the bank and did not bear the words, "By Wisconsin Sugar Company, payable at." Testimony to the same effect was given at the trial.

On April 12th Forsman wrote to the *Citizens State Bank* demanding to know by what authority the acceptance had been altered. In reply it was stated that the bank never intended to assume payment of the draft; that it was merely a trade acceptance by the Wisconsin Sugar Company, collectible at the bank, and that the bank was in no way liable. The letter contained this paragraph:

"In reference to your notation that this trade acceptance was altered to read, 'Accepted January 11, 1921, by Wisconsin Sugar Company, payable Citizens State Bank, Menomonee Falls, Wis. Geo. E. Warth, Asst. Cashier,' this is correct."

The letter was signed "Citizens State Bank, George E. Warth, A. Cashier."

Much conflicting testimony was given by handwriting experts as to the time the words were added. Letters were presented which showed that Herbst Brothers and the *Express Company* expected that a bank acceptance was to take the place of the original sight draft.

In a special verdict the jury found that Warth inserted the words, "By Wisconsin Sugar Company, payable at," before he delivered the draft to Egan; and that Warth had authority to bind the bank by writing an acceptance on the face of the draft.

Judgment was rendered in favor of the bank and against the Sugar Company.

For the appellant there were briefs by *Hoyt, Bender, McIntyre & Hoyt* and *Schoetz & Williams,* all of Milwaukee, attorneys, and *Sydney Wetmore Davidson* of *Carter, Ledyard & Milburn* of New York, of counsel, and oral argument by *Clifton Williams* and *Werner J. Trimborn* of Milwaukee.

For the respondent there were briefs by *Lockney, Lowry*

*& Baird* of Waukesha and *Bloodgood, Kemper & Blood-good* of Milwaukee, and oral argument by *J. K. Lowry.*

A brief was also filed by the *Attorney General* and *William R. Curkeet,* deputy attorney general, as *amici curiæ.*

JONES, J.   A question of fact warmly contested at the trial was whether the draft in suit was altered in the manner and at the time stated by Warth and Egan, or whether it was altered at a later time when it came into possession of the bank.   The statement of facts contains only a small portion of such testimony because we have come to the conclusion that the case must be decided on grounds which render a recital of that evidence unnecessary.   We will add, however, that we are convinced that when the draft was delivered to Forsman in Milwaukee it was in the form recited above; that the alteration was made later and was wholly unauthorized; and that the verdict of the jury to the contrary was not supported by credible evidence.   It follows, therefore, that the plaintiff was entitled to judgment unless one or more of the legal objections raised by defendant prevails.

The first question presented is whether the bank had the power to accept the draft.   The following are the sections of the statutes which were in force when the draft was accepted and which are relied on by plaintiff's counsel as conferring the power:

"Upon making and filing of the articles of incorporation the bank shall become a body corporate and as such shall have the following powers:

"First. To make all contracts necessary and proper to effect its purpose and conduct its business."

"Sixth. To exercise, by its directors, duly authorized officers, or agents, all such powers as shall be usual in carrying on the business of banking; by buying, discounting and negotiating promissory notes, bonds, drafts, bills of exchange, foreign and domestic and other evidences of debt; by receiving commercial and savings deposits under such regulations as it may establish; by buying and selling coin

American Express Co. v. Citizens State Bank, 181 Wis. 172.

and bullion, and by buying and selling exchange, foreign and domestic; issuing letters of credit, and by loaning money on personal or real security, as provided hereinafter." Sec. 2024—9, Stats. 1919.

It can hardly be claimed that the acceptance by a bank of a draft payable in ninety days for the benefit of a customer without security or consideration comes specifically within the description of "buying, discounting and negotiating promissory notes, bonds, drafts, bills of exchange, foreign and domestic and other evidences of debt."

This is conceded by counsel for plaintiff, but it is argued that express power is given to negotiate foreign bills of exchange; that this includes the necessity of indorsing such bills or drafts. It is further argued that the obligations of an indorser include greater power and responsibility than those of an acceptor.

There is little doubt as to the proposition that banks, under the power to negotiate their own bills and drafts, have the power to indorse them, since that is the usual mode of transferring title to such paper. We do not think it necessary to enter into a discussion of the relative responsibilities which a bank incurs by indorsing its own paper or that in which it has a pecuniary interest in the regular course of business, and that assumed by the bank in this instance.

If this acceptance was valid the bank became liable to pay the amount of the draft according to the tenor. Sec. 1677—2, Stats. 1919. According to the terms of the contract the bank was not transferring or indorsing paper of which it was the owner or in which it had an interest, but in effect was agreeing to pay the debt of a third party. The rule is well settled that a bank has not the power to become the guarantor of the obligation of another without benefit to itself unless its charter or governing statute expressly permits it.

"Neither as included in its powers nor incidental to them is it a part of a bank's business to lend its credit. If a bank

could lend its credit as well as its money, it might, if it received compensation and was careful to put its name only to solid paper, make a great deal more than any lawful interest on its money would amount to. If not careful, the power would be the mother of panics, and if no compensation was received, there is the additional reason, if any is needed, that such a power is in derogation of the rights and interests of stockholders, and at all events could only be exercised with the consent of all.

"Indeed, lending credit is the exact opposite of lending money, which is the real business of a bank; for while the latter creates a liability in favor of the bank, the former gives rise to a liability of the bank to another." 1 Morse, Banks & Banking (5th ed.) § 65; Magee, Banks & Banking (3d ed.) § 248; 1 Michie, Banks & Banking, § 99.

This rule is so well established that it is unnecessary to cite the great number of cases which declare it.

It is also claimed by plaintiff's counsel that the acceptance was analogous to a certified check and in substance differs only in the fact of the "ninety days after date" clause; that there is no express statute granting the power to certify checks, and yet it must be admitted that banks have that power. The power to issue certified checks is recognized by sec. 2024—37, Stats., providing that the issuance of such checks is unlawful unless the drawer has on deposit at the time an amount of money equal to the amount specified in the check. The section closes with this clause:

"Any check, draft or order so certified by the duly authorized officer shall be a good and valid obligation against such bank."

The same argument was made in a case decided by the supreme court of Kansas where the statute was almost identical with our own and where there was an acceptance without consideration of a draft payable at a future date. The court first held that a clause in the statute identical with that last quoted above was a recognition of the right

to accept time drafts. But on rehearing, on fuller consideration, this ruling was reversed, the distinction between certified checks and time drafts was pointed out, and it was held that the bank had no power to accept such drafts and was not liable on the acceptance. *Ingersoll v. Kansas State Bank,* 109 Kan. 534, 110 Kan. 122, 202 Pac. 837. We do not believe that there is any such similarity between certified checks and drafts payable at a future date that authority to issue the former implies the power to issue the latter.

Counsel for plaintiff also rely on the language of the statute which gives banks the power "to exercise, by its directors, duly authorized officers, or agents, all such powers as shall be usual in carrying on the business of banking." The only testimony on this subject was that of the bank examiner, who said that it was not the custom of state banks in this state to accept any drafts payable in the future.

In 1915 a bill was introduced in the legislature proposing to extend the power of state banks by adding that of "accepting for payment at a future date drafts drawn upon it by its customers." The bill was referred to several committees and presumably received careful attention, but the proposition was rejected. This action of the legislature indicates that the practice of making such acceptances did not then exist. The power to accept such drafts had not long before been granted by Congress to members of the Federal Reserve system. This amendment above referred to was proposed in the same bill that proposed to permit state banks to join the Federal Reserve system. The rejection of the proposed amendment clearly shows that the legislature understood that state banks did not then have the power now claimed and showed the legislative intent that it should not be granted.

Although it is the province of the courts and not of the legislature to finally determine the construction of statutes, a legislative construction of a statute is entitled to considera-

tion and it has often been said to have great weight.   2 Lewis' Sutherland, Stat. Constr. (2d ed.) §358; 36 Cyc. 1142.

The defendant bank was not a member of the Federal Reserve system.   Prior to the creation of the Federal Reserve banks it was not the practice of banks to accept time drafts.   The Federal Reserve Act of 1913 authorized the practice by member banks, but carefully guarded it by describing the kind of transactions in which acceptances might be made, the security to be given, and limiting the amount of the acceptance as compared with the capital stock and surplus of the bank.   Sub. (5), sec. 9796, U. S. Comp. Stats. 1918.

We are convinced that the contention of plaintiff's counsel that the acceptance in question was one of the powers "usual in carrying on the business of banking" cannot be sustained.

The question arises whether the bank is estopped from pleading its want of power to make the acceptance.   The plaintiff is a corporation doing business in New York and many other states.   Herbst Brothers was also a foreign corporation doing business in New York.   When the sight draft was refused payment, an arrangement was made between Herbst Brothers and the plaintiff whereby a time-draft acceptance should be received in lieu of the former arrangement.

The agent of plaintiff testified that it was an unusual transaction and plaintiff secured the indorsement of Herbst Brothers as additional security.   Plaintiff knew the standing of the Wisconsin Sugar Company "was not of the best" and that it was questioned.   Plaintiff tried to make arrangements "to get the acceptance of a better bank."   It did not succeed and "got Herbst Brothers to indorse the draft after this attempt came to nothing."

The name of the drawee was left in blank and it was left to the Wisconsin Sugar Company, known to be of indifferent

standing, to fill in the name of the bank. The question whether the acceptance should be received was discussed by agents of plaintiff about January 14th or 15th. The subject received special consideration "because it was a very small bank, and also because it was an obligation under one of our commercial credits and it is not customary for us to handle them in that manner." At that time the seed had not been delivered although the bill of lading had been delivered to the Wisconsin Sugar Company on January 11th.

The bank had a capital stock of only $30,000. It was in financial trouble, and on January 5th the chief bank examiner was present at a conference with the officers. The cashier had left the bank in December and up to that time had charge of making loans. Warth, the assistant cashier, had been employed as assistant cashier and his duties consisted mostly of bookkeeping and receiving and paying loans. Before the transaction of the bank acceptance he had made a few loans of small sums from $50 to $100 and one of $500.

At the conference with the bank examiner it was agreed that there were no resources for making loans and Warth was instructed accordingly.

When the draft was accepted the Wisconsin Sugar Company had a balance at the bank of a little more than $100 and owed the bank $90,000. No charge of the draft was made to the Sugar Company's account and no entry of any kind was made in the books of the bank of the January 11th transaction, and the other officers of the bank had no notice of the transaction until the 14th of April.

There are few subjects on which the law is in a more uncertain state than that involved in the question when may a private corporation invoke the defense of *ultra vires* as to acts beyond its powers. The decisions on this subject are innumerable and irreconcilable. The tendency of the older decisions was to hold that, as corporations had no powers

beyond those given under a strict construction of the statutes or their charters, contracts foreign to those purposes were void; that being void they could not be ratified.

The modern tendency is undoubtedly in the other direction. This tendency is thus stated in a decision of this court in which Mr. Justice MARSHALL said:

"The doctrine of *ultra vires* is a most powerful weapon to keep private corporations within their legitimate spheres and to punish them for violations of their corporate charters, and it probably is not invoked too often; but to place that power in the hands of the corporation itself, or a private individual, to be used by it or him as a means of obtaining or retaining something of value which belongs to another, would turn an instrument intended to effect justice between the state and corporations into one of fraud as between the latter and innocent parties. Such is the modern doctrine, evolved and settled in the progress of events, reaching from the time when private corporations were few and the doctrine of *ultra vires* invoked quite as freely as to them as to public corporations, to a time when substantially all restrictions to the formation of such private bodies were removed, and they were authorized and commenced to exist, great and small, everywhere, for the purpose of conducting almost every kind of legitimate business. If such a body transcend its powers it commits a wrong against the state, and ordinarily it is for the state, only, to call it to account for such violation." *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125, 131, 79 N. W. 229.

Accordingly it is generally held that the defense is not available to corporations for wrongs committed by them. *First Nat. Bank v. Graham,* 100 U. S. 699; *Ohio & M. R. Co. v. McCarthy,* 96 U. S. 258.

It is sometimes said that the defense should not succeed where it would result in wrong and injustice. It has sometimes been intimated that by reason of the trend of the decisions the doctrine of *ultra vires* as applied to private corporations has practically disappeared.

The decisions of this court undoubtedly show that within

this jurisdiction the rigor of the old rule has been much relaxed. Some of these later decisions were cited by Mr. Justice MARSHALL in the opinion already quoted. Others are *Fillbach v. First Nat. Bank,* 177 Wis. 520, 188 N. W. 655; *Kanneberg v. Evangelical Creed Cong.* 146 Wis. 610, 131 N. W. 353.

It will be found, however, on examination of the Wisconsin cases on this subject that in nearly every case, if not in every case, there was some element of benefit to the corporation urging the defense, and the same will be found to be true in the large number of cases which might be cited from other jurisdictions in which the defense of *ultra vires* has been denied and in some of which very broad general language is used which might be quoted as tending to show that there is no such defense as *ultra vires.* It is so well settled that in general a corporation cannot commit the rank injustice of enriching itself by retaining the fruits of a contract and then repudiate it that it is hardly necessary to cite authorities on the subject.

There is another line of decisions holding that when contracts have been fully executed on both sides, and especially after considerable lapse of time, the corporation cannot avail itself of the defense that the contract or transaction exceeded its corporate power. This would seem to be analogous to the rule that the defense should not prevail in the face of manifest injustice and where the objector has profited by the transaction. In the federal courts the older rule as to *ultra vires* contracts has been adhered to. In *McCormick v. Market Bank,* 165 U. S. 538, 17 Sup. Ct. 433, it was said (pp. 549, 550):

"The doctrine of *ultra vires,* by which a contract made by a corporation beyond the scope of its corporate powers is unlawful and void, and will not support an action, rests, as this court has often recognized and affirmed, upon three distinct grounds: the obligation of any one contracting with a corporation to take notice of the legal limits of its

powers; the interest of the stockholders not to be subject to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law." See, also, *California Bank v. Kennedy,* 167 U. S. 362, 17 Sup. Ct. 831, citing many cases.

But in the federal courts, although an action cannot be maintained on the unlawful contract, the corporation pleading *ultra vires* may be compelled to pay back what it has received under the unlawful contract. The action in such cases does not rest on the express but on an implied contract. The action is not to affirm, but to disaffirm, the unlawful contract. *Citizens' Cent. Nat. Bank v. Appleton,* 216 U. S. 196, 30 Sup. Ct. 364, and cases cited; note in 32 L. R. A. N. s. 544.

The powers of national banks conferred by the statute are very similar to those given the banks of this state under the statutes already quoted, and it is very clear that these banks have no power to guarantee the commercial paper of third parties or lend credit to them, and that under such facts as exist in this case there would be no estoppel. *California Bank v. Kennedy,* 167 U. S. 362, 17 Sup. Ct. 831; *McCormick v. Market Bank,* 165 U. S. 538, 17 Sup. Ct. 433; *Merchants' Bank v. Baird,* 160 Fed. 642.

As already indicated, there is much difference of opinion in the state courts on the subject of estoppel. We shall not attempt to cite at length or quote from such decisions, as there would be no limit to the undertaking. In most of the cases where the right to plead estoppel where a bank has thus lent its credit has been denied, it will be found that the corporation had an interest in the transaction or had retained its fruits, or that the contract had been fully executed on both sides. It is true that in some of the cases the contract had been executed only by one of the parties, but in such cases it will generally be found that the corporation had been benefited by the transaction. The following are some

of the cases where the right of a corporation to defend on the ground that the contract was beyond its powers has been upheld: *Ingersoll v. Kansas State Bank,* 109 Kan. 534, 110 Kan. 122, 202 Pac. 837; *Best B. Co. v. Klassen,* 185 Ill. 37, 57 N. E. 20; *Sturdevant Bros. & Co. v. Farmers & M. Bank,* 62 Neb. 472, 87 N. W. 156; *S. C.* 69 Neb. 220, 95 N. W. 819; *Cottondale State Bank v. Oskamp N. Co.* 64 Fla. 36, 59 South. 566; *Greeley v. Nashua Sav. Bank,* 63 N. H. 145; *Willett v. Farmers Sav. Bank,* 107 Iowa, 69, 77 N. W. 519; *Laidlaw v. Pacific Bank,* 137 Cal. 392, 70 Pac. 277; *Western Md. R. Co. v. Blue Ridge H. Co.* 102 Md. 307, 62 Atl. 351; *Greene v. Middlesborough T. & L. Co.* 121 Ky. 355, 89 S. W. 228; *Brunswick G. L. Co. v. United G., F. & L. Co.* 85 Me. 532, 27 Atl. 525; *Metropolitan Stock Exchange·v. Lyndonville Nat. Bank,* 76 Vt. 303, 57 Atl. 101; *Ellett-Kendall S. Co. v. Western S. Co.* 132 Mo. App. 513, 112 S. W. 4; *Alabama G. S. R. Co. v. Loveman C. Co.* 196 Ala. 683, 72 South. 311; *Kraniger v. Peoples Bldg. Soc.* 60 Minn. 94, 61 N. W. 904; *Appleton v. Citizens' Cent. Nat. Bank,* 190 N. Y. 417, 83 N. E. 470; *Thilmany v. Iowa P. B. Co.* 108 Iowa, 333, 79 N. W. 68; *International H. Co. v. State Bank,* 38 N. Dak. 632, 166 N. W. 507; *Ætna Nat. Bank v. Charter Oak L. Ins. Co.* 50 Conn. 167; *Nat. Bank of Brunswick v. Sixth Nat. Bank,* 212 Pa. St. 238, 61 Atl. 889; *State ex rel. Hadley v. Bankers T. Co.* 157 Mo. App. 557, 138 S. W. 669; *Commercial B. & T. Co. v. Citizens T. & G. Co.* 153 Ky. 566, 156 S. W. 160; *Wald v. Wheelon,* 27 N. Dak. 624, 147 N. W. 402; *Mallory v. Hanaur O. Works,* 86 Tenn. 598, 8 S. W. 396; *Lucas v. White L. T. Co.* 70 Iowa, 541, 30 N. W. 771; *Day v. Spiral Springs B. Co.* 57 Mich. 146, 23 N. W. 628; *Franklin Co. v. Lewiston Sav. Bank,* 68 Me. 43.

Many of these cases were those in which the corporation as guarantor or surety had attempted to lend its credit to third parties without benefit or consideration to itself. The

list might be greatly enlarged if cases from the federal courts were included.

The question whether a corporation should be estopped to plead *ultra vires* is not purely one of law, but may depend on various circumstances. The nature of the corporate business and the nature of the transaction involved may be material. It· may be important to consider whether the corporation has been benefited by the contract in question and whether it has been fully executed or remains executory. In a New York case it was said:

"The purposes of the defendant's organization are very material in determining the question as to its authority to make the alleged agreement. Where a corporation is organized for business or trading purposes and the only persons interested therein other than its business creditors are its stockholders, and their only interest therein is to secure dividends upon their investment, the question of *ultra vires* is of comparatively small importance except in behalf of the people of the state in their public capacity, and the courts treat the question as it relates to such a corporation very differently than they do in the case of a banking corporation. . . . A banking corporation occupies a different relation to the public in that it invites individuals to submit to it the possession and care of their money and property. All banking institutions occupy a fiduciary position." *Gause v. Commonwealth T. Co.* 196 N. Y. 134, 153, 89 N. E. 476.

In another case from the same state the court said:

"Even a cursory view of the provisions of the statute under which the plaintiff was organized, and the cases giving construction to the powers thereby conferred, renders it quite clear that the contract under which plaintiff claims was not only *ultra vires* but contrary to public policy. . . . The solvency of these institutions was guarded by special provisions and limitations in the act authorizing their incorporation, and has ever since been the object of sedulous care both on·the part of the legislature and of the courts. (Laws 1837, ch. 360; Laws 1854, ch. 329; Laws 1862, ch. 62.) The language employed in the act defines their

powers and duties, and excludes by necessary implication a capacity to carry on any other business than that of banking, and the adoption of any other methods for the prosecution of such business than those specially pointed out by the statute. . . . The spirit of the law, as well as a sound public policy, forbid these institutions from risking the moneys intrusted to their care in doubtful speculations or enterprises." *Nassau Bank v. Jones,* 95 N. Y. 115, 120.

We have here a state of facts very different from those presented in any case which has heretofore come before this court. The amount of the draft as compared with the capital stock and assets of the bank; the indebtedness of the customer intrusted with the authority to fill in the name of the bank in an amount three times the capital stock; the fact that the bank received no security, benefit, or consideration whatever for the transaction; that the bank was already in financial trouble,—are all circumstances tending to show that the acceptance was an act not only beyond the powers of the bank but contrary to the public policy of the state. That the transaction was contrary to the public policy of the state is shown not only by the limitation imposed on the powers of banks but also by the express refusal of the legislature to confer the power to accept drafts payable at a future date.

There is no doubt that plaintiff was chargeable with notice of the powers of the bank conferred by the statute. This rule is so well settled that the citation of authority is unnecessary. The facts already stated indicate that the plaintiff was not only charged with such constructive notice, but the testimony of its agents shows that it failed to use reasonable care in taking the acceptance and delivering the seeds after doubts had arisen as to the standing of the Wisconsin Sugar Company in view of the amount of the draft and the limited capital of the bank.

This want of reasonable care in some degree distinguishes the case from many which rely on the hardship to the party affected when the defense of *ultra vires* has been pleaded.

Since we hold that the act in question was beyond the statutory power of defendant, the case is also distinguishable from many others where the action of the corporation was within its powers but was irregularly exercised and without the formalities required by law. Of course it is also distinguishable from a great number of cases denying the right to plead *ultra vires* because the corporation pleading it had been benefited by the transaction.

Another question involved is this: Could the defendant corporation be heard to raise the defense of *ultra vires?* In *Eastman v. Parkinson,* 133 Wis. 375 (113 N. W. 649), this court said at page 381:

> "This court and most courts hold that an *ultra vires* contract, one not within the scope of the corporate authority to make under any circumstances, which is no longer executory and is not tainted by fraud or clearly prohibited by statute, or condemned by sound public policy, cannot be impeached by the corporation or any one representing it; that the only remedy is one on behalf of the state to punish the corporation for violating the law."

. In other cases cited in that opinion the same general rule was declared. In this case and in many others where this rule has been declared the corporation raising the defense had been benefited by the contract. In many others the contract had been fully executed on both sides. There are numerous decisions of this court where the corporation has raised the defense of *ultra vires* and where it has been sustained. *Miley v. Heaney,* 168 Wis. 58, 169 N. W. 64; *Kilbourn City v. Southern Wis. P. Co.* 149 Wis. 168, 135 N. W. 499; *Pelton v. Spider Lake S. & L. Co.* 132 Wis. 219, 112 N. W. 29; *S. C.* 117 Wis. 569, 94 N. W. 293; *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125, 79 N. W. 229; *Chippewa Valley & S. R. Co. v. C., St. P., M. & O. R. Co.* 75 Wis. 224, 44 N. W. 17; *Northwestern U. P. Co. v. Shaw,* 37 Wis. 655; *Madison, W. & M. P. R. Co. v. W. & P. P. R. Co.* 7 Wis. 59, 65, 66. The same is true in many cases cited

above from other jurisdictions. It will be observed that in this state the rule has not been adopted that in all cases the exclusive remedy is the intervention of the state.

It is the usual history of bank failures, far too frequent, that it is suddenly announced in the newspapers that the bank is in trouble. Its doors are suddenly closed. There may have been careful supervision by the state bank examiner, but the records may disclose nothing showing the wrongdoing of the bank officials, or, as in this case, the making of a contract or contracts wholly unauthorized which may endanger the solvency of the bank. After a bank has become insolvent and hundreds, perhaps thousands, of innocent depositors are in distress, it is but poor comfort to them that the state may interfere and deprive the bank of its charter or that they may bring suit against the officers who have brought ruin to the bank and who are also often insolvent.

If before failure or afterward the bank itself is allowed to defend *ultra vires* contracts fraudulently or ignorantly made and which are contrary to the public policy of the state, some protection is afforded to depositors. It has never been held in this state that such protection may not be afforded, and we are not now disposed to deny that it may be given.

We hold that the acceptance relied on was unauthorized and *ultra vires*. As to the other questions discussed, no attempt is made in this decision to lay down general rules which would apply in all cases where estoppel is pleaded as a defense to *ultra vires* contracts. Such attempts have sometimes tended to confuse rather than clarify the law.

We hold that under the facts of this case there was no estoppel to plead the defense of *ultra vires* and that defendant had the right to defend on that ground.

A question is raised as to the taxation of costs. The plaintiff garnished an account of the defendant at a Milwaukee bank. In order to secure a release defendant filed a bond, under sec. 2771, Stats. Defendant paid a surety com-

pany for this bond $327.37, and the clerk of the court allowed it as part of the costs of the proceeding, but upon objection by the plaintiff it was disallowed by the court. Defendant excepted to the order and gave notice that it would seek a review of the ruling.

Defendant's counsel claim that this amount should be allowed as part of the taxable costs under sub. (1), sec. 2921, Stats., which provides for "all the necessary disbursements and fees of officers allowed by law," and under sec. 2771, Stats., which provides that on the discharge of the garnishee and surrender of the money or property "the costs shall be taxable as disbursements of the plaintiff in the action if he recovers."

No authority is cited for this contention and we do not find in the statutes any warrant for allowing to the defendant this item as part of its costs. We need only allude to the familiar rule that costs are a creature of the statute.

*By the Court.*—Judgment affirmed.