MILEY, imp., Appellant, vs. HEANEY and others, Respondents.

MILEY and others, Respondents, vs. HEANEY and another, imp., Appellants.

*May 1—November 6, 1918.*

*Corporations: Sale of stock: Real purchaser: False representations: Misunderstanding as to price: Written contract: Varying by parol evidence: Validity of contract: Meeting of minds: Assumption by buyer of debt of seller: Incomplete novation agreement: Stock in pledge: Rescission of contract: Action in equity: Right to jury trial: Unlawful diversion of corporate assets: Power of officers and of interested directors: Knowledge and assent of stockholders: Custom: Constructive notice of facts shown by books of corporation: Liability to restore diverted assets: Subrogation: Bills and notes: Corporation as accommodation maker: Right to recover payments made: Bankruptcy: Rights of trustee.*

1. In an action upon promissory notes given in payment for certain shares of corporate stock and to foreclose a lien created as collateral security, findings by the trial court that the maker of the notes was the real purchaser of the stock and signed the notes as principal and not merely as surety for

her husband, and that the purchase was not induced by any fraudulent representations made by or on behalf of the seller, are *held* to be sustained by the evidence.

2. A false representation made by the seller of property to the buyer that another prospective buyer had inquired as to the amount for which the property could be bought, if not accompanied by any representation as to what such other person would pay or any misrepresentation as to the value of the property or any other material fact, did not constitute actionable fraud.

3. As a result of negotiations between the seller of corporate stock and the husband of the buyer, who had, however, no authority to act for her, the seller supposed that in addition to giving notes for $110,000 the buyer was to assume and pay a debt of about $15,000 owing by him to the corporation. The buyer supposed that the notes for $110,000 were to be in full payment. She executed said notes and, to secure them, an assignment of her interest in her father's estate, in which was a recital that the notes had been given in payment for the stock; and thereupon the seller executed to her an assignment of the stock. A note to the corporation for the amount of the seller's debt above mentioned, and a novation agreement as to said debt, reciting the execution of such a note, were drawn but were never presented to or signed by the buyer and she had no knowledge thereof. *Held,* that the instruments which were executed, taken together, constituted a complete written contract, the terms of which cannot be varied by parol evidence. It was incumbent upon the seller, under the circumstances, to see that the whole agreement was embodied in the written contract, and he cannot now claim that this was not done; nor can the buyer now avoid liability on such written contract according to its terms, on the ground that there was no meeting of the minds as to the price to be paid for the stock and hence no contract between the parties.

4. The assignment of corporate stock to a buyer thereof stated that the shares "have been and now are, with the consent of said [buyer], in escrow or pledge" to a certain bank as security for a certain debt of the corporation to the bank. The stock remained so pledged for a time, but was eventually delivered to the buyer. *Held,* that if the buyer ever had a right to rescind the contract because of failure to deliver the stock such right could not be exercised after the stock was in fact delivered and accepted.

5. All issues arising in an equitable action, and especially questions which directly involve the right to equitable relief, are triable by the court, and neither party has a right to have such issues tried by a jury.

6. The buyer of the corporate stock, as above stated, not having agreed to assume or pay the seller's debt to the corporation, could not be held liable therefor by the corporation or its trustee in bankruptcy; nor was the seller's liability therefor discharged by the incomplete novation agreement, although that had been approved by the directors of the corporation.

7. The buyer of a majority of the stock of a corporation conducting a department store constituted her husband her agent in the management of the business, and thereafter, pursuant to an agreement between her, her husband as such manager, and the seller of the stock, the corporation from time to time delivered moneys and merchandise from the store to said seller, charging the same to said buyer as advances upon her share of the anticipated net earnings of the business, and the amounts thereof were credited by said seller upon the buyer's notes given to him in payment for his stock. *Held*, that this transaction was not a usual one in the ordinary course of business in which a managing officer could bind the corporation; and that where, as in this case, a majority of the board of directors were interested in such agreement adversely to the interests of the corporation, such board could not bind the corporation thereby unless all of the stockholders should with full knowledge assent thereto.

8. The advances so made being wholly out of proportion to anything said buyer was entitled to receive in the way of dividends, and the arrangement being in effect an attempt to finance her purchase of the stock by loans out of the assets of the corporation, the stockholders cannot be charged with acquiescence therein unless direct knowledge thereof on their part is shown. The fact that previously, for a number of years during which the corporation had been making large earnings but declaring no dividends, it had been the custom to allow stockholders to obtain advances as needed or asked for, such advances being charged on their open account and treated as in lieu of dividends, cannot be construed as an acquiescence in the loans here in question, especially as they were made at a time when the corporation was earning little if any money.

9. Stockholders are not charged with knowledge of the contents of or entries in the ordinary financial books of account of a corporation.

10. The assets of the corporation used in making advances, as above stated, to the seller of the stock or for his benefit and applied in discharge of the buyer's indebtedness to him on her notes, having been unlawfully diverted, both the buyer and the seller of the stock are liable for their restoration to the

corporation or to its trustee in bankruptcy; but the seller, having applied the amount thereof on the buyer's indebtedness to him, should, if he pays that amount to said trustee in bankruptcy, be subrogated to such trustee's rights against the buyer.

11. A finding by the trial court that a note to a bank, executed by a corporation and indorsed by one M., who was its president and principal stockholder, the proceeds of which note were credited by the bank to the corporation and for the amount of which the corporation then gave its check to M., was in fact given by the corporation for the accommodation of M. and that he did not thereby become the debtor of the corporation, but that the corporation merely became his surety to the bank, is *held* to be sustained by the evidence.

12. The corporation, accommodation maker of said note, having thereafter paid to the bank certain sums of interest on the note for the benefit of M., and after bankruptcy of the corporation certain dividends from its assets having been paid to the bank upon the note, the trustee in bankruptcy was entitled to recover from M. the amounts so paid, with interest, but was not entitled to recover from him the whole amount of the note.

13. The right which a corporation has to recover its assets which have been unlawfully diverted passes to its trustee in bankruptcy and he may maintain an action for such recovery when necessary to liquidate the claims of creditors of the corporation.

APPEALS from a judgment of the circuit court for Milwaukee county: A. H. REID, Judge. *Modified and affirmed.*

On the 4th day of January, 1913, *J. P. Miley* owned 600 shares, E. A. Heaney 300 shares, and G. M. Barrett 100 shares of the capital stock of the G. M. Barrett Company, which company was the proprietor of a department store in the city of Milwaukee. This constituted all of the outstanding capital stock of said company, except 100 shares of preferred stock of the par value of $50 per share owned by the Germania Publishing Company.

For many years *Miley* and Heaney had been the principal managing officers of the business of the corporation, *Miley* holding the office of president and treasurer and Heaney that of vice-president and secretary. *Helen Heaney* is the

wife of E. A. Heaney, also daughter and heir-at-law of Philipp Jung, then deceased.

On or about the 4th day of January, 1913, *Miley* sold and assigned his 600 shares of stock in said Barrett Company to *Helen Heaney*. In payment thereof *Helen Heaney* executed to *Miley* fifteen promissory notes, aggregating $110,000, indorsed by her husband, E. A. Heaney, and, as collateral security therefor, executed to *Miley* an assignment of all her right, title, and interest in and to her share of the estate of Philipp Jung, her father, then deceased. Thereafter *Miley* assigned to the *Kneeland-West Lumber Company* one of said notes for $8,936.70 and to the *Germania National Bank* four of said notes, aggregating $27,612.72.

This action was brought by *Miley*, the *Kneeland-West Lumber Company*, and the *Germania National Bank* to recover certain amounts then due on said notes, to have the amounts to become due thereon adjudicated, and for a foreclosure of the lien created on *Helen Heaney's* share of Philipp Jung's estate by virtue of the assignment executed by her to *J. P. Miley* to secure the payment of said notes.

On the 16th day of March, 1915, the Barrett Company was adjudicated bankrupt, and the *First Trust Company* of Milwaukee, Wisconsin, was appointed trustee in bankruptcy for the said Barrett Company. On the 28th day of August, 1915, the *First Trust Company*, as such trustee in bankruptcy of the said Barrett Company, was made a party defendant to the action. It filed its answer to the complaint of the plaintiffs and a cross-complaint against *Helen Heaney* and *John P. Miley*, which cross-complaint was considered by this court upon demurrer in 163 Wis. 134, 157 N. W. 515. The nature of the cross-complaint, so far as material here, will sufficiently appear from the opinion.

The following is a brief presentation of some of the outstanding facts: The G. M. Barrett Company was incorporated in September, 1899, and from that time until its

bankruptcy March 16, 1915, conducted a department store in the city of Milwaukee. At the time of its incorporation its capital stock consisted of 1,000 shares of common stock of $100 each, $60,000 of which was owned by G. M. Barrett and $40,000 by *John P. Miley.* Some time prior to February 17, 1903, *Miley* purchased from Barrett 500 additional shares, making him the holder of 900 shares of the par value of $90,000, and leaving Barrett the holder of 100 shares. Some time between February 17, 1903, and January 16, 1904, *Miley* interested the defendant E. A. Heaney, then a man of about twenty-nine years of age, in the business, and agreed to transfer to him 100 shares of stock then outstanding in his name. Heaney paid $1,000 in cash, and it was understood that the balance was to be paid out of the earnings of the stock. On the 14th day of February, 1903, *Miley* also transferred to Henry J. Killilea 200 shares of his 900 shares of stock, on credit, with the understanding that the earnings thereon from time to time would be applied on payment of Killilea's indebtedness to *Miley* therefor. From that time until the 9th day of August, 1911, at which time Killilea sold his stock to the defendant E. A. Heaney, the stockholders of said company consisted of said Barrett, owner of 100 shares; *Miley,* owner of 600 shares; Killilea, owner of 200 shares; and Heaney, owner of 100 shares. As stated, Killilea was eliminated as a stockholder on the 9th day of August, 1911, when Heaney purchased his 200 shares. From February 17, 1903, to January 18, 1908, the board of directors consisted of Barrett, *Miley,* and Killilea; from January 18, 1908, to January 20, 1912, of *Miley,* Killilea, and Heaney; and from January 20, 1912, to 1913, of Barrett, *Miley,* and Heaney. *Miley* was president and treasurer and Heaney vice-president and secretary of the company from January 16, 1904, to 1913.

On February 1, 1905, *Miley* borrowed from the *Germania National Bank* on his demand note the sum of $30,000, and on a note executed by the G. M. Barrett Company to him

(of which more will be said hereafter) the sum of $10,000. He pledged to the bank at that time the 900 shares of stock which had been issued in his name, 200 of which he had agreed to transfer to Killilea and 100 of which he had agreed to transfer to Heaney.  All of this stock remained pledged to the *Germania National Bank* until the time of the sale by *Miley* of his stock to *Mrs. Heaney*.  It also remained in pledge with said bank for some time after such sale, which circumstance will receive specific attention later. As further security for the $30,000 loan there was executed to the bank by *Miley,* Killilea, John H. Kopmeier, and Clem F. Romadka an instrument dated February 1, 1905, which was declared on its face to be a continuing guaranty of said $30,000 loan.

During this time the corporate business was handled pretty much as a partnership affair.  *Miley,* Heaney, and Killilea purchased merchandise from time to time on credit and drew money from time to time on open accounts.  All of these items were charged against them.  No dividends were actually declared, but they were treated as entitled to sixty, ten, and twenty per cent., respectively, of the earnings as the same were computed at the end of each year.  On January 10, 1910, the books of the company showed a surplus sufficient, if correct, to warrant a dividend of 100 per cent. A dividend of that amount was declared and credited to the stockholders of the company in proportion to the amount of the stock held by them to absorb such surplus. The business of the company was conducted at a store on West Water street up to 1909, at which time it was moved to a new location on Grand avenue.  Until its removal the business was very prosperous, and enabled Killilea and Heaney to pay for their stock for the most part out of the earnings of the company.  After its removal its net earnings greatly depreciated, if indeed they did not entirely disappear.

In July, 1911, Philipp Jung died, leaving an estate which inventoried at more than $700,000.  By the terms of his

will he left the bulk of his estate to his wife and three children, of whom the defendant *Helen Heaney,* wife of E. A. Heaney, was one; providing, however, that the estate should be administered for a term of years by trustees designated in the will. It will thus be seen that, upon the death of Philipp Jung, Heaney's wife gained a certain affluence. This enabled Heaney, in August, 1911, to raise sufficient money to purchase Killilea's stock upon a note signed by *Mrs. Heaney.*

There is evidence tending to show that ever since 1909, when the store was moved to Grand avenue, *Miley* had desired to sell his interest in the corporation, and from time to time a sale of his stock by *Miley* to Heaney had been suggested but not seriously considered, for the reason that Heaney had no way of paying for the same. This desire on the part of *Miley* to dispose of his interest in the company was emphasized to Heaney in December, 1912. It appears that some time during the month of December, 1912, a perfect stranger dropped into the real-estate office of J. W. Disch of Milwaukee, and stated that he had heard that the Barrett store was for sale. Disch, testifying, thought he asked if Disch could get a price on the property and certain other information that he asked for. Disch thought he could. The man asked for an inventory and statement of assets and liabilities and the terms as to how much had to be cash, etc. This man told Disch that if the store could be bought for $100,000 he would pay Disch $10,000 commission. If it could not all be bought he wanted Disch to find out what a controlling interest could be bought for. He told Disch his name and where he was from, but Disch could not recall this at the time of trial. He gave no references as to his financial ability and Disch made no inquiry. The man said he was going to Chicago and would be back to see him later. He never came back and Disch never heard from him again. Disch went to one J. C. Sundin, another real-estate broker in Milwaukee, told him the circumstance,

asked him to find out if the Barrett Company business was for sale, the price, terms, etc., and offered to divide the commission with him if a sale were consummated. Nothing was said by Disch to Sundin concerning the identity of this prospective purchaser or his financial responsibility. Sundin was acquainted with *Miley*. After the interview with Disch he wrote *Miley* a letter asking if the business or a controlling interest was for sale, the price, terms, etc., and suggesting that he had a prospective purchaser for the same. *Miley* showed the letter to Heaney. *Miley* made no reply to the letter. Sundin either wrote again or called *Miley* on the telephone asking for a reply to his inquiry. *Miley* told Heaney that Sundin was pressing for an answer. Heaney urged him not to sell. *Miley* insisted that he had wanted to get out of the business for some time on account of his health and thought he ought not to miss the opportunity. He had the bookkeeper make out a statement showing the value of his interest in the business. This statement showed *Miley's* interest to be worth around $108,000. *Miley* gave Heaney a copy of this statement. He told Heaney that he would sell to Sundin's prospective purchaser for that amount, but he would rather sell to him.

About this time Killilea met Heaney and told him that he understood *Miley* was going to sell. He reminded Heaney what position he would be in if an outsider acquired a controlling interest in the company. He reassured Heaney that *Miley* was going to sell. He suggested to Heaney that he ought to buy *Miley's* stock and offered to and did see the Jung family to induce them to indorse Heaney's notes for the amount of *Miley's* stock. Heaney was much wrought up. He feared that a controlling interest by strangers would deprive him of his position and otherwise militate against his interests. The matter of indorsing Heaney's notes was taken up with the Jung family, first by Killilea and then by Heaney. The Jung family refused to become surety on his notes. It was then suggested that *Mrs. Heaney* could se-

Miley v. Heaney, 168 Wis. 58.

cure the notes by giving an assignment of her interest in the Jung estate. A sale was finally arranged. *Mrs. Heaney* executed her notes for $110,000 and an assignment of her share in the Jung estate as collateral security, and *Miley* executed a transfer and assignment of his stock, 600 shares, to *Helen Heaney.* These papers bear date January 4, 1913, although it seems certain that they, or some of them, were executed January 9, 1913. During the time of the preliminary negotiations *Mrs. Heaney* was sick in a hospital, where she had given birth to a child. She and *Miley* had no personal negotiations. They were conducted by Heaney and *Miley.* At the time the papers were signed *Mrs. Heaney* had been brought home, but she was still confined to her bed. After the sale and transfer *Miley,* to outward appearances, maintained his usual relations with the company, continued his presence in the store, and pretended to act as its president and treasurer until some time in March at least.

During the preliminary negotiations it had been figured by *Miley* and Heaney that the notes could be met and the stock paid for out of the earnings of the corporation plus her income from the Jung estate. *Miley* continued to secure merchandise and cash from the store as usual, which were, in the first instance, charged to him on the books of the corporation. Upon his protest, however, that such advances should be charged to *Mrs. Heaney* instead of to him, because such advances were to be treated as a credit upon *Mrs. Heaney's* indebtedness, resolutions by the board of directors were adopted from time to time transferring the account from him to *Mrs. Heaney;* in other words, charging the account, appearing against him on the books of the company, to *Mrs. Heaney* and in terms releasing him therefrom.

The action was tried by the court and judgment was rendered in favor of *Miley* and against *Helen Heaney* for the sum of $25,100.72 then due on said notes, and adjudging that there was to become due to the plaintiff *Miley* on said notes the sum of $50,071.90; that there was due to the

plaintiff *Germania National Bank* on said notes from the said *Helen Heaney* the sum of $13,657.66 and that there was to become due the sum of $15,934.72; that there was due the plaintiff *Kneeland-West Lumber Company* $1,101.90 and to become due $8,936.70; that the *First Trust Company* recover from *John P. Miley* the sum of $25,840.61 and from *Helen Heaney* the sum of $24,149.21. The judgment further decrees a foreclosure of the lien created by the assignment aforementioned, unless *Helen Heaney* shall pay the amount of said judgment rendered against her into court by a day fixed therein. From the judgment so entered *Helen Heaney, First Trust Company,* and *John P. Miley* appealed.

Fifteen briefs in all were filed on the various appeals by the following attorneys, all of Milwaukee: by *Miller, Mack & Fairchild* for *Helen Heaney;* by *Frank M. Hoyt* and *Thomas M. Kearney* for *John P. Miley* and *Kneeland-West Lumber Company;* by *Austin, Fehr & Gehrz* for *Germania National Bank* and *F. M. Wilmanns;* and by *Bottum, Bottum, Hudnall & Lecher* for *First Trust Company,* as trustee in bankruptcy. The cause was argued orally by *J. G. Hardgrove* and *Geo. P. Miller;* by *Frank M. Hoyt* and *Thomas M. Kearney;* by *Gustave G. Gehrz;* and by *Louis A. Lecher.*

The following opinion was filed July 8, 1918:

OWEN, J. *Helen Heaney's* principal defenses to plaintiffs' complaint were (a) that she was not the purchaser of the stock but merely surety for her husband, who was the real purchaser; (b) that she was induced to enter into the contract by reason of false representations made by *Miley* with reference to the value of the property; (c) that she and her husband were induced to enter into the contract of purchase by reason of representations that a stranger stood ready and willing to buy the stock, that such representations were false, and that they would not have entered into the contract except for such fraud and deceit so practiced; and (d) that there was not a meeting of the minds upon the

amount that was to be paid for the stock, for which reason no contract was engendered and she is not liable on her notes and the assignment of her interest in the Jung estate as collateral security.

The first three grounds of defense above enumerated are questions of fact pure and simple. As was said in *Eberhardt v. Randall,* 166 Wis. 480, 166 N. W. 6:

"We do not approach the determination of the question submitted here as triers of fact in the sense that that term is ordinarily understood. Before we can disturb the finding of the trial court we must be satisfied from a consideration of all the evidence that it appears that the trial court found against the great weight or clear preponderance of the evidence. A fair presentation of the question presented by this record would require a restatement of the entire evidence. This, as has often been said, we will not make."

The lower court found that *Helen Heaney* purchased the stock as principal and not as surety. It also found that no fraudulent representations were made by *Miley* to *Helen Heaney* concerning the value of the stock which constituted an inducement on her part to enter into the contract of purchase. With these findings of fact we are entirely satisfied. Indeed, it is doubtful if contrary findings could command the approval of this court upon those questions. While there is evidence tending to cast doubt upon the question of whether the stock was worth $110,000 at the time the contract of sale was entered into, there is no evidence whatever that *Helen Heaney* relied upon any representation made in that behalf by *Miley.* A statement taken from the books of the company by the bookkeeper in its employ showed *Miley's* interest to be worth something over $108,000. This statement was shown to E. A. Heaney. He was director, vice-president, and secretary of the company and, the evidence shows, was as fully conversant with the condition of its affairs as was *Miley.* It is absurd to say that *Miley* could misrepresent either the condition of the company or the value of its stock to Heaney. But however that may be,

there is no evidence that *Mrs. Heaney* relied upon anything that *Miley* said or did with reference to the value of the stock. It is true that this statement was shown to her at the time she signed the notes. She, however, did nothing more than to look at the footings, which showed *Miley's* interest to be worth something in excess of $108,000. She asked her husband if he thought it was worth that, and he replied that he did. If she relied on anything it was on the statement of her husband. She knew that he was fully conversant with the condition of the company and, very naturally, relied upon his judgment with reference to value. We can see nothing upon which a finding that the value of the property was fraudulently misrepresented to *Mrs Heaney* could be based.

Upon the question as to whether she signed as principal or surety, the facts, to our minds, are equally conclusive. In the first place, the notes and the assignment given by her as collateral security therefor purported on their face to be her individual contracts. The assignment of the stock executed by *Miley* transferred the stock to her. These circumstances have more than a passing significance. It is true, of course, that parol evidence is admissible to show that her contract is one of surety rather than of principal. But there is nothing to support this claim except the testimony of Mr. and *Mrs. Heaney,* which is contradicted by every circumstance in the case. After the transaction was consummated she was treated as a stockholder by the company. She was elected a director and vice-president and voted a salary of $1,200 a year. While she testified that she attended no directors' meetings (and such seems to be the fact) and said she knew nothing of her election as director and vice-president, it seems extremely unlikely that all this could have occurred without her knowledge. A number of renewal notes were executed by her as the principal notes became due. When the company became hard pressed financially, in an effort to compromise with creditors *Mrs.*

*Heaney* signed another note to the defendant *Wilmanns* for $10,000 and executed to him a second assignment of her interest in the Jung estate as security therefor; and, finally, *Helen Heaney* testified upon her examination under sec. 4096 of the Statutes: "He [E. A. Heaney] did not tell me I was going security. I cannot say that. He said, 'You sign your name. You are not going to lose anything.' The idea that I now have of going security has come to me since that time. I think it came to me at the time of the bankruptcy."

Bearing in mind the rule that persons are chargeable with notice of the contents of writings signed by them, and considering all the circumstances of this case, we feel that the finding of the court to the effect that *Mrs. Heaney* was principal rather than surety upon these notes is fully justified, and we do not see how we can be expected to say, upon this record, that the finding of the trial court to this effect is against the clear preponderance of the evidence. We have not attempted and will not enter into a discussion of all the evidence bearing upon this question. We have said this much merely for the purpose of indicating the more persuasive facts and circumstances tending to support the findings of the court.

Upon the question of the decoy purchaser the trial court said:

"*Miley* did not personally or through any agent misrepresent to either E. A. Heaney or *Helen Heaney* any fact respecting negotiations for sale of his interest in G. M. Barrett Company to a prospective purchaser represented by Sundin. While the evidence presents grounds for strong suspicion that the man who appeared at Disch's office was not a *bona fide* prospective purchaser, careful study of the evidence fails to present to my mind any sufficient support to sustain a finding that the man who appeared at Disch's office did not have in fact some purpose to negotiate in good faith, or that *Miley* either personally or through any agent procured the man to appear at Disch's office and simulate negotiations. Such a finding could be made only on clear and satis-

factory evidence, and the inferences to be drawn from the evidence which are consistent with innocence of *Miley* seem quite as strong and reasonable as the contrary inferences, or more so."

This issue was introduced by reason of an amendment permitted to *Helen Heaney's* answer upon the trial of the case, pursuant to notice of motion to amend theretofore given, to the effect that *Miley,* with two others, entered into a conspiracy to create in the mind of E. A. Heaney the belief that *Miley* had a prospective purchaser for his interest in the company, and that unless Heaney should either buy *Miley's* interest or cause the same to be bought by someone friendly to him the controlling interest in the company would fall into strange and unfriendly hands, thereby not only depriving Heaney of the position he then occupied with the company but jeopardizing his financial investment therein. When we consider all the facts and circumstances surrounding this transaction we cannot say that our minds are entirely freed from the suspicion that *Miley* might have had something to do in procuring the visit of this stranger to Disch's office as a start for simulated and pretended negotiations calculated to have a disturbing effect upon Heaney. However, there is not a syllable of testimony to connect *Miley* in any way with the inquiring stranger. A finding holding *Miley* responsible for the stranger's visit would have little more than suspicion to support it. It is apparent that the able and experienced judge who tried this case pondered this feature well and weighed and balanced the evidence with great care. In order to justify a finding against *Miley* upon this issue, his connection with the stranger would have to appear by clear and satisfactory proof. Bearing this in mind, and bearing in mind the further fact that this court will not disturb a finding of the lower court unless it appears to be against the clear preponderance of the evidence, we are persuaded that this finding cannot be disturbed.

We have dealt with this question upon the assumption that if the facts were as claimed by *Helen Heaney* they would constitute a defense. The question of whether such circumstances constitute actionable fraud or deceit was not raised or discussed. It is a general rule that, for misrepresentations to constitute actionable fraud, they must have been of a material fact. We know of no authority sustaining the proposition that the mere representation on the part of a seller that another stands ready and willing to purchase the property offered for sale constitutes actionable fraud or deceit. However, where a decoy purchaser is made use of to corroborate or impress upon the prospective buyer a misrepresentation concerning the value of the property sold, or some other material fact, as was the case in *Hull v. Doheny,* 161 Wis. 27, 152 N. W. 417, actionable fraud may result, not because of the representation that another stands ready and willing to buy, but because of the material misrepresentation thus corroborated. In this case the decoy purchaser was not used to impress Heaney with an inflated value of the property or any other material fact. The obvious effect of the introduction of this presumed purchaser was to disturb Heaney with the thought of what might happen to him if a controlling interest in the company should fall into unfriendly hands. It is manifest that every person holding a minority interest in a corporation such as this is continuously confronted by a similar hazard. The record here shows quite conclusively that *Miley* was anxious to sell and that he was likely to sell whenever the opportunity should be presented. This was a hazard, therefore, which continuously faced Heaney. Its impending was simply impressed upon him by the incident. There was no representation that the alleged prospective purchaser would pay $110,000 or any other amount. If there was any false representation at all, it consisted only in the fact that someone had made inquiry as to the amount that the business or a controlling interest therein could be bought for. To hold

such a representation to be actionable fraud would place a severe limitation upon "dealers' talk" and reduce many contracts to mere scraps of paper.

*Helen Heaney* further contends that there was no meeting of the minds upon the question of the price to be paid for the stock; that consequently there was no contract between the parties; that she is not liable upon any contract, and, if liable at all, only for the reasonable value of the stock. This contention is based upon the following circumstances: At the time of the purchase and sale of the stock, to wit, on or about January 4, 1913, *Miley* was indebted to the G. M. Barrett Company on an open book account for an amount approximating $15,000. He contends that it was understood that *Helen Heaney* was to assume and pay this indebtedness to the G. M. Barrett Company in addition to the $110,000 evidenced by her promissory notes. Her contention is that she did not agree to pay *Miley's* indebtedness to the G. M. Barrett Company, and that the $110,000 evidenced by her promissory notes was to be in full payment, and not in part payment, of the stock. As to this the trial court found as follows:

"*Helen Heaney* never assumed or agreed to pay *Miley's* debt to the G. M. Barrett Company on book account which was outstanding on January 4, 1913. The negotiations for sale of the *Miley* stock were begun between *Miley* and E. A. Heaney. *Helen Heaney* at first had no part in it and had not given Mr. Heaney any general authority to act for her, and had not given *Miley* reason to believe that she had conferred authority. Most of the terms of the bargain were agreed upon before *Mrs. Heaney* was consulted, E. A. assuming to act for his wife and in anticipation that she would assent. *Miley* had no personal negotiations with *Helen Heaney*. *Miley* had no knowledge of what terms *Helen Heaney* had agreed to accept except as the same were embodied in instruments signed by her, and except as E. A. Heaney orally reported. The papers executed by her contain no reference to the book account of *Miley* due to the company. And there is no evidence that *Helen Heaney* was informed, before the execution of the papers by her, that

the bargain included any agreement to assume that debt. It appears that she was not so informed. *Helen Heaney* had not at that time either constituted her husband, E. A. Heaney, her general agent with full authority to bind her to any terms of the bargain upon which he should decide, nor had she given *Miley* reasonable ground to believe that she had so constituted her husband her agent. The novation agreement 'Exhibit O' and the blank note drawn in connection therewith was never submitted to *Helen Heaney* and she never became bound by the attempted novation. The notes and assignment signed by *Helen Heaney* contain on their face no intimation that there was any further consideration for the stock than the $110,000 of secured notes. It seems unnecessary to determine whether 'Exhibit O' and the blank note, 'Exhibit L,' were prepared at the same time when the other papers dated January 4th were prepared, since the evidence fails to show that *Mrs. Heaney* ever orally agreed to pay *Miley's* book account or assented to the proposed novation."

As found by the trial court, preliminary negotiations leading up to the consummation of the sale were conducted by *Miley* and Heaney, and it appears pretty clearly that the agreement between *Miley* and Heaney was that *Helen Heaney* was to assume the book account which the Barrett Company held against *Miley*. This was explained to the attorney who drew the papers in the case, and he advised that the transfer of this indebtedness could be brought about by having *Helen Heaney* execute her note for the amount of such indebtedness to the Barrett Company, after which the directors should adopt a resolution accepting said note in full discharge of *Miley's* indebtedness and releasing him therefrom. It appears that a note for the amount of such indebtedness running to the Barrett Company, to be signed by *Helen Heaney*, was drawn by him, but the same was never presented to nor signed by *Helen Heaney*. The following agreement was also prepared:

"This agreement, made and entered into this 4th day of January, 1913, by and between G. M. Barrett Company, a corporation duly organized under and existing by virtue of

the laws of the state of Wisconsin, first party, and *John P. Miley* of Milwaukee, Wisconsin, second party, witnesseth:

"Whereas, said second party is owing said first party certain moneys charged against the account of said second party on the books of said first party, arising out of certain advances made to said second party by said first party of moneys, goods, wares, and merchandise.

"Whereas, *Helen Heaney*, of the city of Milwaukee, Wisconsin, has this day executed her certain promissory note for the sum of $15,127.85 to said first party in payment of said debt of said second party to said first party, as aforesaid:

"Now, therefore, in consideration of the sum of one dollar to it in hand paid, the receipt whereof is hereby acknowledged, and in consideration of the receipt of said promissory note of said *Helen Heaney* as aforesaid, which is hereby accepted as payment of said indebtedness of said second party to said first party, said first party does hereby remise, release, quitclaim, and discharge said second party of and from any and all claims arising out of any such advances made by said first party to said second party of moneys, goods, wares, and merchandise.

"In witness whereof said first party has caused these presents to be signed by its president and countersigned by its secretary, and its corporate seal to be hereunto affixed, this 4th day of January, 1913."        [Signatures.]

This agreement was approved at a meeting of the officers and directors of the company held on the 9th day of January, 1913. It will be observed, however, that *Helen Heaney* never signed this agreement, and the testimony is conclusive that she never knew anything about it. It will be observed, further, that the agreement recites that she "has this day executed her certain promissory note for the sum of $15,127.85 to said first party in payment of said debt of said second party to said first party, as aforesaid." This, admittedly, she had not done. It therefore appears that *Miley* expected he was selling for approximately $125,000, while *Helen Heaney* assumed that she was purchasing for $110,000. In this sense there was not a meeting of the minds as to the terms of the contract. As we view it, how-

ever, it does not follow that a contract was not engendered. Whatever the preliminary negotiations between the parties were, the agreement between them was subsequently reduced to writing, and we must look to the consummated written instruments to ascertain what the contract was.

In the first place, *Helen Heaney* executed to *Miley* her fifteen promissory notes aggregating $110,000, and to secure the payment of said notes she executed an assignment of her interest in the estate of Philipp Jung, deceased, and, in passing, we may note that such assignment contained this recital: "Whereas, said first party has this day sold, assigned, transferred, and conveyed unto said second party 600 shares of the capital stock of G. M. Barrett Company, a corporation duly organized and existing under and by virtue of the laws of the state of Wisconsin, of the par value of $100 per share, and said second party *in payment therefor* has this day duly made, executed, and delivered to said first party her fifteen certain promissory notes in writing for the aggregate sum of $110,000," which recital would seem to indicate that $110,000 constituted the entire purchase price of the stock. Then *Miley* executed to *Helen Heaney* an assignment of his 600 shares of stock in words and figures as follows, to wit:

"Indenture made this 4th day of January, 1913, between *John P. Miley* of Milwaukee, Wisconsin, party of the first part, and *Helen Heaney* of Milwaukee, Wisconsin, party of the second part, witnesseth:

"That said party of the first part, in consideration of the sum of one dollar and other valuable consideration in hand paid, the receipt whereof is hereby acknowledged, by these presents does sell, assign, transfer, and set over unto the party of the second part, her executors, administrators, and assigns, with full power to transfer the same on the books of the corporation, all his right, title, and interest in and to 600 shares of the capital stock of the G. M. Barrett Company, a corporation organized under and existing by virtue of the laws of the state of Wisconsin, with its principal place of business at Milwaukee, Wisconsin. And said party

of the first part further covenants and agrees with said party of the second part, her executors, administrators, and assigns, that at the request of her or them he and his executors, administrators, and assigns shall and will, at all times hereafter, execute any instrument that may be necessary to vest completely in her or them all his right, title, and interest in and to the above described shares of stock herein assigned or intended to be assigned.

"It is further understood that the said 600 shares herein referred to, of said G. M. Barrett Company, owned by said party of the first part, have been and now are, with the consent of said party of the second part, in escrow or pledge to *Germania National Bank* as and for security and pledge for the certain indebtedness of said G. M. Barrett Company to said *Germania National Bank,* amounting to a sum not exceeding $10,000.

"In witness whereof the parties hereto have hereunto set their hands and seals at Milwaukee, Wisconsin, this 4th day of January, 1913.                    JOHN P. MILEY.
                                                   "E. A. HEANEY."

These documents, upon their face, seem to constitute a full and complete transaction and, taken together, express all the terms of the agreement between the parties. *Helen Heaney* executes her notes to *Miley* for $110,000; to secure those notes she executes an assignment of her interest in the Jung estate, in which it is recited in effect that in payment of said 600 shares the said *Helen Heaney* has executed her fifteen certain promissory notes for the aggregate sum of $110,000; then, in another and separate instrument, *Miley* assigns the stock to her. We must hold that these instruments, taken together, constitute a complete written contract, the terms of which cannot be varied by parol evidence. *Sigerson v. Cushing,* 14 Wis. 527. Under the circumstances, it was incumbent upon *Miley* to see that the full understanding between himself and *Mrs. Heaney* was embodied in the written contract. He cannot now claim, especially in this action, that the written contract does not correctly express the terms of the agreement between them, and cannot modify its provisions by parol evidence.

*Helen Heaney* also makes point of the fact that the stock was not immediately delivered to her, but that it remained for some time on deposit with the *Germania National Bank* as collateral security for certain notes of *Miley* and the Barrett Company. We can see no point to this contention. The stock was eventually delivered to her and she subsequently came into full physical possession of it. If she ever had the right to rescind the contract because of the failure to deliver the stock, she did not exercise that right before the stock was delivered, and certainly she could not exercise it thereafter. It is argued in her brief that this is another point upon which the minds of the parties did not meet, as it was no part of the understanding that the stock should continue in pledge as collateral security. The assignment of the stock which *Miley* delivered to her contains this provision: "It is further understood that the said 600 shares herein referred to, of said G. M. Barrett Company, owned by said party of the first part, have been and now are, *with the consent of said party of the second part,* in escrow or pledge to *Germania National Bank* as and for security and pledge for the certain indebtedness of said G. M. Barrett Company to said *Germania National Bank."* She must be presumed to have had knowledge of this provision of the assignment, and, fairly construed, it gives her consent to a continuation of the pledge. In any event she has not been harmed by the fact that the stock remained pledged for a time, and we cannot regard the incident as of any importance nor accord to the contention any merit.

It is claimed by *Mrs. Heaney* that the *Germania National Bank* and the *Kneeland-West Lumber Company* were not holders in due course of the notes transferred to them by *Miley*. In view of the fact that no infirmities are found with reference to the notes, it seems unnecessary to consider that question further. *Mrs. Heaney* has no defense to the notes either in the hands of *Miley* or any one else.

*Helen Heaney* demanded a jury trial upon the issue of fraud raised in her answer to the complaint and on her

counterclaim. This demand was refused by the court. She assigns such refusal as error, although it is not argued or discussed in the brief. It will be noticed that this is an equitable action. It is brought for the purpose of foreclosing the lien upon *Helen Heaney's* share of Philipp Jung's estate arising from her execution of the assignment to *Miley* as collateral security for her notes. Her defense is that she was induced to sign the notes by reason of fraud perpetrated upon her, and in her counterclaim she asks that such notes be surrendered and canceled because of such fraud. We had supposed it was well settled in this state that all issues arising in an equitable action, and especially questions which directly involve the right to equitable relief, are triable by the court, and that neither party has a right to have such issues tried by a jury. *Stilwell v. Kellogg,* 14 Wis. 461; *Connecticut Mut. L. Ins. Co. v. Cross,* 18 Wis. 109; *Truman v. McCollum,* 20 Wis. 360; *Warren Webster & Co. v. Beaumont H. Co.* 151 Wis. 1, 138 N. W. 102. In view of the fact that this question was not urged in the brief, we shall indulge in no further discussion thereof.

We will now consider the issues arising upon the cross-complaint of the *First Trust Company.* As already stated, the G. M. Barrett Company was declared bankrupt, and the *First Trust Company* was appointed trustee in bankruptcy on the 19th day of March, 1915. Upon motion and order it was made a defendant herein. It has already been stated that at the time of the transfer of *Miley's* stock to *Helen Heaney* he was indebted to the Barrett Company in the sum of approximately $15,000, and that after such transfer, pursuant to an agreement made between *Helen Heaney,* E. A. Heaney, and *John P. Miley,* he continued to procure cash and merchandise from the store on the credit of *Helen Heaney,* such advances to be credited by him on *Helen Heaney's* indebtedness to him. The court found that the amount of such advances in cash and merchandise so made between the 4th day of January, 1913, and the 26th day of December, 1914, was $13,263.16. He also found that in

addition to said sum of $13,263.16 there was paid by the Barrett Company for the defendant *Helen Heaney,* upon the indebtedness evidenced by the aforesaid notes, on and between July 5, 1914, and December 26, 1914, to parties other than the plaintiff *Miley,* the sum of $10,656.88, as follows: $5,150 on July 5, 1913, to Merchants & Manufacturers Bank of Milwaukee, in payment of a $5,000 note of *Helen Heaney.* to *Miley* and deposited with said bank as collateral security; $2,250 on and between February 3, 1914, and April 4, 1914, to the Marshall & Ilsley Bank of Milwaukee, being the principal of three notes of $750 each, executed by the defendant E. A. Heaney for and on account of the defendant *Helen Heaney,* in part payment of the notes mentioned in the complaint, the said three notes of $750 each being at the time of payment thereof held by said bank; $500 on December 26, 1914, to Marshall & Ilsley Bank to apply on a like note held by said bank; $2,000 on July 6, 1914, to the *Germania National Bank* in part payment of the Killilea note for $5,000, maturing July 4, 1914, which was then held by said bank; $256.88 on September 2, 1914, to the *Germania National Bank* in part payment of the same note of *Helen Heaney* held by said bank; $250 on October 5, 1914, and $25 on October 12, 1914, to the Jonas Automobile Company in payment of an indebtedness of said *Miley* to said Automobile Company.

The *First Trust Company* sought a judgment against *Mrs. Heaney* and *Miley* for all of said indebtedness. The court awarded judgment against *Miley* for the sum of $15,455.12, the amount of the book account due from said *Miley* to the Barrett Company on the 4th day of January, 1913, and against *Mrs. Heaney* for the sum of $20,720.04, being the amount of advances made from the assets of the Barrett Company for and on account of *Mrs. Heaney's* indebtedness to *Miley* as above itemized, less credit of $1,200, her salary for one year as vice-president, and $2,000 in cash paid in by *Mrs. Heaney* to apply on her account, the same be-

ing the income from her father's estate. From this judgment the *First Trust Company* appeals, and claims it is entitled to judgment against *Mrs. Heaney* as well as *Miley* for the $15,455.12, the amount of *Miley's* book account on January 4, 1913, and that it is entitled to judgment against *Miley* as well as *Mrs. Heaney* for $16,263.14 of the $20,720.04 for which it recovered judgment against *Mrs. Heaney*. *Miley* appeals from the judgment, and claims that he is not liable for the $15,455.12 because the same was assumed by *Mrs. Heaney* to apply on the purchase price of his stock. *Mrs. Heaney* claims that she is not liable for the advances made by the Barrett Company and charged to her, for which judgment in the amount of $20,720.04 was rendered against her. It thus appears that upon the issues raised by the cross-complaint none of the parties are satisfied with the judgment.

We have already decided that *Mrs. Heaney* did not assume or agree to pay the amount of *Miley's* indebtedness to the Barrett Company at the time of the transfer of his stock to her and that she never made any agreement to assume or agree to pay it. In the absence of any such agreement, neither the Barrett Company nor the trustee in bankruptcy has the least foundation for a claim against her for such indebtedness, and in the absence of such an assumption of said indebtedness by her there is no foundation for the claim made by *Miley* that he does not owe it. There was not a novation, because *Mrs. Heaney* did not agree to pay the debt; and there could not be a discharge of *Miley's* liability, because of a lack of consideration and want of power on the part of the officers of the Barrett Company to give away the assets of the corporation. This part of the judgment must therefore be affirmed.

The court found that after the transfer of the stock by *Miley* to *Helen Heaney* she constituted E. A. Heaney her agent to represent her in the management of the Barrett Company business and in the care of her interest therein, and to

arrange for the payment of her said notes to the plaintiff *Miley* as the same became due. We approve of this finding. The trial court further found that it was thereupon agreed between her and the said *Miley* and the managing agents of the G. M. Barrett Company that the said G. M. Barrett Company would pay and deliver to said *Miley* moneys and merchandise upon her credit and responsibility, and as an advance upon her share of anticipated net earnings of the business, sufficient to meet the interest and principal upon said notes as the same became due, and that the amounts of said money and merchandise should be charged to her on the books of the company and applied by said *Miley* in the reduction of her indebtedness represented by said notes, and that pursuant thereto there was delivered to *Miley* cash and merchandise to the amount of $13,263.16. As was further found by the trial court:

"These withdrawals were, of course, directly for the benefit of both the Heaneys, and Mr. Heaney, as manager of the business, was in no position alone to authorize this irregular way of drawing earnings in advance of dividend for his own benefit and for the benefit of his wife. This was more than a simple extension of credit to *Mrs. Heaney* on sales of goods in the usual course of business. It was not a simple delivery of goods to A. on the credit of B. in the usual course of merchandising, which a manager would be fully authorized to do without consulting directors. It amounted to making large loans of the assets of the company as a favor to majority stockholders and would plainly be beyond the power of Mr. Heaney as manager, especially in view of his personal interest in it, and would constitute a misappropriation for which the Heaneys and *Miley* would all have been liable were it not for the practice having been followed for many years with the approbation of all stockholders."

We agree with the trial court that the transaction was not a usual one in the ordinary course of business where a managing officer could bind the corporation. We have little difficulty in arriving at the conclusion that this arrangement

could have been made binding upon the Barrett Company, if at all, only by proper action of the board of directors. At the time of the sale the directors of the company consisted of *Miley,* Heaney, and Barrett. While it is argued that *Miley* ceased to be a director on sale of his stock by force of sec. 1776 of the Statutes, it appears nevertheless that he continued to act as director and president of the company until August 5, 1913, at which time *Helen Heaney,* E. A. Heaney, and John D. Kemper were elected directors of the company. Neither the first nor the last board of directors had power to bind the company in this manner, for the reason that a majority of both boards of directors were interested in the contract adversely to the interests of the corporation.

"The directors of a corporation are not permitted to use their position of trust and confidence to further their private interests, nor to become parties to contracts concerning corporate affairs intrusted to their management which conflict with a free and impartial discharge of their duties toward the stockholders. Any participation by them in contracts dealing with matters of corporate interest which is antagonistic to their free and impartial discharge of official duties is denounced by the law, unless all of the stockholders with full knowledge assent thereto." *Timme v. Kopmeier,* 162 Wis. 571, 576, 156 N. W. 961.

This seems to have been appreciated by the trial court, and he justifies the arrangement upon the theory that all stockholders had knowledge of the fact that such advances were being made and acquiesced therein. His finding to this effect is as follows:

"From 1902 to 1910, inclusive, the directors of the G. M. Barrett Company declared no dividends, although the company during that period made large earnings. During this period, and before, the custom prevailed of allowing the stockholders to obtain advances as needed or asked for, and the amounts thereof were charged upon their open accounts. From time to time statements were made showing the surplus accumulated by the company and the interest of each

stockholder therein, and said advances were intended as a means of distribution of such surplus. By these means the books showed that each stockholder was apparently heavily indebted to the company, *Miley's* apparent indebtedness exceeding $73,000, which sum was mainly used by him to pay indebtedness incurred in his purchase from Barrett. In 1910 a 100 per cent. dividend was declared and these book accounts thereby wiped out and the surplus reduced. Thereafter the custom of making similar advances was continued and no further dividend was declared during the continuance of the company in business. This custom was well known to all holders of common stock and was assented to by them. Regular annual statements of the business and financial condition of the company were prepared in January of each year, and each stockholder informed thereof, until the year 1915, when the G. M. Barrett Company was forced into bankruptcy. All stockholders, including the one holder of preferred stock, must be presumed to have had knowledge of the contents of the books and the custom aforesaid of making advances to stockholders, and no objection thereto was ever made."

We do not think the custom prevailing from 1902 to 1910 of allowing stockholders to obtain advances as needed or asked for and the amounts thereof charged on their open account, such advances being treated as in lieu of dividends, can be construed as an acquiescence on the part of the stockholders in the advances made to *Miley* upon the credit of *Helen Heaney*. In the first place, prior to 1910 the Barrett Company was earning dividends, and the advances made were reasonably proportioned to the earnings to which the stockholders were entitled. After the sale the company earned little if any money. The advances made to *Miley* upon the credit of *Helen Heaney* were altogether out of proportion to anything she was entitled to receive from the company in the way of dividends. They were loans, pure and simple, of large amounts of money, and cannot be compared with the reasonable credit or advances allowed stockholders at a time when the company was in a prosperous condition. It was an attempt to finance her undertaking out of

the assets of the Barrett Company. In order to charge the stockholders with knowledge of and acquiescence in these loans direct knowledge thereof must be shown.

The trial court found that all stockholders, except the Germania Publishing Company, the owner of fifty shares of the preferred stock of the company, did have actual knowledge of these loans. In order to charge the Germania Publishing Company with such knowledge the trial court evidently relied upon an erroneous principle of law, as indicated by the following sentence: "All stockholders, including the one holder of preferred stock, must be presumed to have had knowledge of the contents of the books and the custom aforesaid of making advances to stockholders, and no objection thereto was ever made." We know of no principle of law which charges stockholders with knowledge of the contents of or entries in the ordinary financial books of account of a corporation. Such a rule would be a very harsh one indeed and, to our minds, could not be grounded upon any conceivable reason. It is well known that stockholders of a corporation are frequently scattered far and wide, and that as a matter of fact few of them do, or have the opportunity to, examine the books of account of a corporation. Assuming that annual statements couched in general terms in the form of reports may be made to the stockholders, such statements are seldom in sufficient detail to apprise them of transactions of this character. There being no finding that the Germania Publishing Company had notice of these transactions, and in fact no evidence upon which such finding could be based, it necessarily follows that the agreement pursuant to which the assets of the company were applied in discharge of *Helen Heaney's* indebtedness to *Miley* was without any legitimate authority to support it and was not binding upon the Barrett Company. It follows, also, that the assets of the company used for this purpose were unlawfully diverted, and that *Miley*, who received the same with full knowledge of all the facts and circumstances, is liable for their restoration to the company. This applies to

the open book account representing the amount of cash and merchandise so paid and delivered to *Miley* upon the credit of *Helen Heaney*, which the court found to be $13,263.16.

It also appears that in addition to this amount there was delivered to *Miley* July 6, 1914, payable to his order, the check of the Barrett Company for $2,000 to be applied by *Miley* in payment of one of *Helen Heaney's* notes for $5,000 which *Miley* had deposited with the *Germania National Bank* as collateral security; that there was also delivered to *Miley* in cash by the Barrett Company in December, 1914, the sum of $500 to be applied on one of *Mrs. Heaney's* notes then held by *Miley*. It seems plain to us that these two items are on the same footing as other cash and merchandise delivered to *Miley*. Although *Miley* had deposited the $5,000 note at the *Germania National Bank* for collateral security, he had by no means parted with all interest therein. He was as much interested in the payment of the note after as he was before the deposit. The $2,000 check, therefore, was for *Miley's* benefit, and he is as much responsible for that as for any other item, either cash or merchandise, delivered to him. The court also found that $250 on October 5, 1914, and $250 on October 12, 1914, were paid by the Barrett Company to the Jonas Automobile Company. This is another item for which *Miley* is clearly liable. To the sum of $13,263.16, therefore, there should be added the $2,000 check of July 6, 1914, the $500 cash advanced in December, 1914, and the $500 paid to the Jonas Automobile Company, in all $16,263.16, for which the *First Trust Company* is entitled to a judgment against both *John P. Miley* and *Helen Heaney*. In view of the fact that *Mrs. Heaney* has been credited with this amount on her indebtedness to *Miley*, it should be provided in the judgment that if *Miley* pays this amount he be subrogated to the rights of the *First Trust Company* against *Mrs. Heaney*.

On the 1st day of February, 1905, the G. M. Barrett Company executed its note to the *Germania National Bank*

for $10,000, which was indorsed by *J. P. Miley* and the proceeds of said note credited to the account of G. M. Barrett Company. On the 2d day of February the G. M. Barrett Company executed its check for $10,000 to *J. P. Miley.* This note was renewed from time to time and was outstanding at the time of the bankruptcy of the G. M. Barrett Company.    It was claimed by *Miley* that this note was executed by the G. M. Barrett Company for his accommodation, and that the indebtedness represented thereby was his and not that of the Barrett Company, primarily; that he was not the debtor of the Barrett Company by virtue of the transaction, but that the Barrett Company was merely his surety to the bank. The *First Trust Company* contended that *Miley* was the debtor of the Barrett Company, and sought to recover judgment for the entire sum of $10,000 represented by the check given to *Miley* on the 2d day of February, 1905. Upon this issue the court found as follows:

"On or about February 1, 1905, G. M. Barrett Company, for the accommodation of the plaintiff *Miley,* executed and delivered to the plaintiff *Germania National Bank* its promissory note for the sum of $10,000, for the purpose of enabling the said *Miley* to procure a loan from said bank for that amount, which loan was then and there made by the bank crediting to Barrett Company on its books $10,000 and by Barrett Company giving to *Miley* its check for $10,000. Payment of the indebtedness represented by said note and by the renewal thereof was on February 1, 1905, guaranteed to said bank by said *Miley* and three others, and said loan was made by said bank on the credit of said note and guaranty. Said note was renewed from time to time by notes of the G. M. Barrett Company, the last renewal thereof being a note for the sum of $10,000 executed by said company to said bank, dated September 28, 1914, due ninety days thereafter, bearing interest at the rate of seven per cent.

"Said *Miley* paid the interest which accrued on said original note and on all of the renewals thereof down to February 1, 1911, by means of checks of Barrett Company which were charged to *Miley* on books of Barrett Company.

Thereafter, down to December 28, 1915, the interest accruing on said renewal notes was paid by said Barrett Company without being so charged. The amount of said interest thus paid by said company is $2,154.24.

"On March 16, 1915, upon due proceedings in that behalf had in the district court of the United States for the Eastern district of Wisconsin, said G. M. Barrett Company was duly adjudged a bankrupt. Thereupon the defendant *First Trust Company* was by said court duly appointed trustee in bankruptcy of said G. M. Barrett Company and has duly qualified and is in discharge of its duties.

"The plaintiff bank proved up its claim on said note of the G. M. Barrett Company for $10,000, dated September 28, 1914, against said company in the bankruptcy proceedings at the sum of $10,042, being the principal of said note with interest thereon from December 28, 1914. There has since been paid to said bank thereon by said trustee the following dividends: April 22, 1914, $2,510.50; April 11, 1915, $301.36; total, $2,811.86."

The court ordered judgment against *Miley* on account of this transaction for the sum of $2,154.24, the amount of interest paid on said note by the G. M. Barrett Company, together with interest thereon, and for the sum of $2,811.86, the amount of dividends paid in bankruptcy proceedings to the plaintiff bank upon the note of said Barrett Company, together with interest on the items of said dividend from the date of payment to the date of judgment. As already stated, the *First Trust Company* complains of such disposition of this transaction, and contends that it is entitled to judgment for the entire sum of $10,000 with interest. We think the finding of the trial court to the effect that the original note given by the Barrett Company was merely for the accommodation of *Miley*, and that *Miley* did not become the debtor of the Barrett Company by virtue of the transaction, is fully sustained by the evidence, and that the disposition made by the trial court of this item cannot be disturbed.

It is earnestly contended that the trustee in bankruptcy cannot maintain an action for the recovery of these various sums so unlawfully diverted from the assets of the Barrett

Company to *John P. Miley*. We think there can be little doubt of the right of the trustee in bankruptcy to maintain this action. It is well settled that an action can be maintained by the corporation to recover its assets which have been unlawfully diverted in this manner. *State v. Milwaukee E. R. & L. Co.* 136 Wis. 179, 185, 186, 116 N. W. 900. It is well settled that the trustee in bankruptcy takes such rights and interests in the property of the bankrupt as the bankrupt himself had. The Barrett Company had the right at any time to bring an action against *Miley* for the amount of these unlawful diversions, and, upon the appointment of a trustee in bankruptcy, we have no doubt of the right of the trustee to maintain the action to recover the same when necessary, as here, to liquidate the claims of creditors against the corporation. There can be no doubt of this in view of secs. 70 *a* and 47 *a* (2) of the federal bankruptcy act.

From what we have said it follows that the judgment should be affirmed on the appeals of *Helen Heaney* and *John P. Miley*. Upon the appeal of the *First Trust Company* the judgment should be modified, providing for a joint recovery against *Helen Heaney* and *John P. Miley* for the sum of $16,263.16 and against *Helen Heaney*, individually, of $4,456.88, interest, to be computed as indicated by the trial court in its findings of fact and conclusions of law.

*By the Court.*—Judgment affirmed upon appeals of *Helen Heaney* and *John P. Miley*. Upon the appeal of the *First Trust Company* the judgment is modified as indicated in the opinion, and, as so modified, is affirmed. *John P. Miley* to recover full costs against *Helen Heaney*. The *First Trust Company* to recover costs for printing its briefs against *John P. Miley*. No other costs to be taxed.

KERWIN and ESCHWEILER, JJ., dissent.

A motion for a rehearing, made on behalf of the plaintiffs, and a like motion made on behalf of the defendant *Helen Heaney*, were denied on November 6, 1918, without costs, except clerk's fees to be paid by plaintiffs.